BALDWIN (JOHN SIMMONS CO., Intervener) v. ABERCROMBIE & FITCH CO. (JUSTRITE MFG. CO., Intervener).

(District Court, S. D. New York. February 6, 1915.)

PATENTS ☞328—VALIDITY AND INFRINGEMENT—ACETYLENE GAS-GENERATING LAMP.

> The Baldwin reissue patent, No. 13542 (Original No. 821,850), for acetylene gas-generating lamp, claim 4, the principal features of which are that the water tube extends down into the mass of the carbide and within it is a movable rod or stirrer, which controls the flow of water and also is used to break up the slaked carbide which cakes at the delivery end of the tube, was not anticipated, discloses invention, and is not invalid, as broadening the invention of the original patent because the rod is not limited to one having a bent arm; also *held* infringed.

In Equity. Suit by Frederick E. Baldwin (the John Simmons Company, intervener) against the Abercrombie & Fitch Company (the Justrite Manufacturing Company, intervener) for infringement of patent for acetylene gas-generating lamp. On final hearing. Decree for complainants.

James Q. Rice and M. C. Massie, both of New York City, for plaintiffs.

James R. Offield and Charles K. Offield, both of Chicago, Ill., for defendants.

MAYER, District Judge. The original of this reissue (No. 821,850) was before the Circuit Court of Appeals for the Seventh Circuit in Bleser v. Baldwin, 199 Fed. 133, 117 C. C. A. 615, and (inter alia) was held valid, but not infringed. The opinion is dated April 23, 1912, and on February 5, 1913, Baldwin filed his application for a reissue, which was granted on March 11, 1913, only about five weeks thereafter.

This reissue patent was recently considered by Judge Orr in the Western District of Pennsylvania, in Baldwin v. Grier Brothers Company, 215 Fed. 735, and by him held valid. Since the trial of the suit at bar, the Court of Appeals for the Third Circuit has decided the appeal in the Grier Case, and, reversing the court below, has held that the reissue was broadened over the original patent and that "thus construed claim 4 cannot be sustained."

Passing for the moment the question of the validity of the reissue, two courts have decided that what Baldwin did arose to the dignity of invention, and with that conclusion I heartily agree. True, the generation of acetylene gas was old, and acetylene lamps were old, when Baldwin undertook the problem; but "the difficulty in the art," as

Judge Orr said, was "to regulate the flow of water to the carbide so that there will not be a greater amount of gas liberated by the chemical action than is required for use."

While Baldwin's invention was intended for use as a lamp for bicycles, automobiles, and miners, its commercial utility has been principally in connection with miner's cap lamps, and therefore we are dealing with a device in which safety and simplicity of construction and operation are controlling considerations. The successful operation of such a lamp depends upon supplying the water continuously at the proper rate. If the water is fed too fast gas will be generated too rapidly, and will blow through the burner, if fed too showly the flame will die down, and if fed not uniformly the flame will be unsteady.

"The method which I have invented," said Baldwin in his specification, "for securing the proper feed under all circumstances without the above objectionable features is to make the bore of the duct of comparatively large size, extend the tube which forms the duct downward so that its end will be always embedded in the carbide and then restrict the duct by means of a wire or rod preferably centrally located therein to leave a channel of the proper size. This arrangement is simple; but in a long experience it has been found to be entirely successful. It is possible to secure the correct drop-by-drop feed with a duct of considerable size, since the friction of the water on the large area of the tube wall and wire reduces its flow. This retarding friction may be regulated by varying the size of wire used. The duct does not become choked, since if foreign particles are deposited therein the water can take a zigzag course around it without the supply being appreciably affected. If it is at any time necessary to clean the tube, the wire is simply reciprocated and rotated a few times from the outside of the lamp without disturbing the position of other parts. This nice regulation of the flow enables me to entirely dispense with the troublesome adjustment of the valve. If a valve is used at all, it is employed to shut off the flow entirely, and not to regulate it. The construction just described is shown in Fig. 1, in which L is the water-supply tube, and N the constricting wire. In this illustration the size of the parts is of course exaggerated. Fig. 2 shows a similar construction with a valve M on the constricting wire M' which may be set by turning the screwplug M² in the top of the lamp. In some cases, however, there is employed in connection with the means for introducing the water into the mass of carbide a device in the nature of a stirrer, which on proper manipulation may be used to break up the mass of carbide surrounding the outlet of the water duct, and which, by having become slaked and caked by the action of water, prevents the proper percolation of the latter to the unslaked carbide in the receptacle G, Fig. 1. As such device I employ a stem or rod N, which extends down through the tube L and is bent at substantially right angles to form an arm N'. This rod may form a prolongation of the valve stem M' of Fig. 2, or in case no valve is used may extend from the top of the lamp down through the water reservoir, as shown in Fig. 3."

What Baldwin claimed (in claim 4 here in controversy) was:

"4. In a lamp of the kind described, the combination with a water reservoir, and a receptacle for calcium carbide, of a water tube extending from the former a considerable distance into the latter and adapted to be embedded in the mass of carbide in the receptacle, and a rod extending through the water tube, and constituting a stirrer to break up slaked carbide around the outlet of the water tube, *the rod operating to restrict and thus control the flow of water to the carbide*, as set forth."

The function of the stirrer is described in the specification as follows:

"*It will be understood from what has been said that the function of the stirrer is to break up, pierce or disturb the particles of the slaked carbide mass which, when the lamp is in use, forms at the delivery end of the tube. This slaked carbide mass tends to solidify, and either shuts the water off altogether or restricts it, so that less water is delivered from the water tube than the lamp demands for efficient operation. As it is sufficient, under certain circumstances, to insure the requisite water flow by so manipulating the stirrer as to pierce, break up, or loosen the slaked carbide mass immediately around or at the mouth of the tube, it is obvious that the stirrer need not always be formed with a bent end or so as to extend radially from the mouth of the tube.*"

The underlined parts of the above quotations show what was added in words in the reissue over the original patent.

The most striking characteristic of the Baldwin lamp is its departure from the prior art, in that the water tube, instead of terminating above the carbide or being protected by a screen, is extended down and buried in the carbide mass.

The stirrer is also an important feature, because it obviates the choking apparently invited by burying the end of the water tube in the carbide mass. By making the water restricting and controlling rod movable, and by having its end protrude from the end of the water tube, a device is produced which, properly manipulated, may be used to break up the mass of carbide surrounding the outlet of the water duct. After the lamp has been running for a time the sludge which forms as the carbide is hydrated, packs around the end of the water tube, and prevents "the proper percolation of the water to the unslaked carbide" in the carbide receptacle. The stirrer so disturbs the sludge at the end of the tube that the normal water flow is resumed.

It seems unnecessary to consider at length the prior art patents which were before the courts in the two previous cases, but in this suit over 20 prior art references were introduced, of which 13 (if my count is right) now appear for the first time. Of these, the publication in Dingler's Polytechniches Journal, a German technical journal, is the only one worthy of consideration, and that in connection with the Schmitt British patent, No. 15,688 of 1898, which was in the Grier case.

Any one interested in the discussion of the Handshy (No. 591,132), Marechal (British No. 29,405), or Mosher (No. 644,439) patents may refer to the testimony of plaintiffs' expert, Mr. Proctor, whose views, as to these patents, I fully accept.

In the Schmitt British patent no disclosure is made of the tube embedded in the carbide, nor is there shown a restricting rod or a stirrer such as in the Baldwin patent and commercial structure.

In the Dingler publication, the disclosure is of an acetylene lamp of the drip tube with a water-controlling valve and a screen tube to keep the carbide away from the end of the drip tube—in other words, Schmitt's theory was almost the opposite of Baldwin's.

Curiously, Mr. Proctor came into possession of a bicycle lamp (Exhibit 15) of whose authenticity I am entirely satisfied, which seems to embody the Schmitt invention. One need but examine this physical structure to realize the greater simplicity and efficiency of the Bald-

win device, and to conclude that Baldwin accomplished a highly meritorious result.

As has been said more than once, often the prior art shows how little has been contributed by a claimed invention, but quite as often it discloses how much the last man, by, perhaps, only some little change or addition or omission of an element, has advanced; and while the patent in suit is far from a pioneer, the Baldwin lamp has practically been a pioneer commercially of miner's acetylene cap lamps, and deservedly so.

Doubtless the manufacturers of carbide, in order to sell their product, have helped in every way they could to introduce a carbide-consuming device in order to displace candles and oil lamps; but that effort alone was not enough to accomplish the sale of over 1,000,000 of these lamps in less than eight years—a result achieved only after overcoming the prejudice of the miners and the opposition of public officials in some quarters.

But Baldwin, like many a meritorious inventor, has had his troubles. By the construction given to the claim in the Bleser suit, it would seem that claim 4, as then phrased, might be construed as covering any rod in the water tube to be embedded in the carbide which would act as a stirrer, and as not limited to a water restricting and controlling rod also constituting a stirrer. Under such circumstances it is not easy to determine what to do. Shall a reissue be applied for, or shall an attempt be made to secure a different result in a different circuit, in the hope thereby of reaching the Supreme Court?

Baldwin decided to apply for a reissue, and now the reissue is attacked as broadening the invention, and as failing in every respect to come within the remedial purposes of the reissue statute. Reissues often present troublesome questions, but the ultimate test, I think, is good faith. The extremes of obtaining what is justly due on the one hand and endeavoring to lasso the art on the other are illustrated in Motion Picture Patents Co. v. Laemmle et al., 214 Fed. 787, and National Casket Co. v. Stolts, 197 Fed. 940, affirmed 204 Fed. 963, 123 C. C. A. 305.

In the suit at bar, I am satisfied that the Patent Office was right when it promptly allowed a reissue. Let me follow the history of the patent and its commercial exploitation.

The application for the original patent, No. 821,580, was filed July 15, 1903, but was not granted until May 22, 1906. About July, 1903, Baldwin manufactured a large gang lamp (holding about three pounds of carbide) by means of which several men could work. This lamp had the bent arm or stirrer as it is called. As early as December, 1905, however, the miner's cap lamp was made, and early in 1906 it was put on the market, and in this was the straight rod, which, among other things, has characterized the commercial lamp ever since. Thus, even before the grant, Baldwin had exemplified practically, in an actual device which went extensively into use, the precise combination which is now before us. The straight rod idea was thus not after-acquired from some other source, but was an alternative form, applicable to a

small lamp in which the area of agitation was much smaller than that of a gang lamp.

Between 1906 and 1909, when the suit of Baldwin v. Bleser was begun, there was no occasion for Baldwin to bother himself about the patent. He had the right to rely upon what the government had given him, and so far as the evidence discloses nobody questioned the validity of the patent. In April, 1911, the Circuit Court in Baldwin v. Bleser entered its decree holding the patent valid and infringed, and certainly, while that decree stood, there was no occasion for Baldwin to apply for a reissue. Shortly after this, to wit, in July, 1911, defendant Justrite Company sold its first alleged infringing lamps, but there is no testimony showing that knowledge of such sale came to plaintiffs. On April 23, 1912, the Circuit Court of Appeals handed down in Bleser v. Baldwin, and then for the first time the problem of what to do was presented to Baldwin.

It is urged that the construction of the original patent limits the stirrer element to a bent arm, and that to construe it as including a straight rod would be to broaden by reissue. But the testimony is convincing that the straight stirrer and the bent stirrer function exactly the same. One is suitable for a small area of carbide, and the other for a large area. They both stir, and I confess myself unable to see how a stirrer is not a stirrer.

As is well understood, claims are drawn to protect, if possible, against ingenious attempts at infringement, and so we usually see one claim in a series broader or narrower than another. If Baldwin meant to restrict himself to a bent stirrer, why the qualifying words (underscored) in claim 2 and not in claim 4?

"2. In a lamp of the kind described, the combination, with a water reservoir and a receptacle for calcium carbide, of a tube extending from the former into the latter so as to be embedded in the mass of carbide contained in the receptacle, a rod extending from a point outside of the lamp through the tube and into the carbide-chamber and *having its end bent to form a stirrer for breaking up the slaked carbide around the outlet of the water tube*, as set forth."

"4. In a lamp of the kind described, the combination, with a water reservoir and a receptacle for calcium carbide of a water tube extending from the former a *considerable distance* into the latter and adapted to be embedded in the mass of carbide in the receptacle, and a rod extending through the water tube and constituting a stirrer to break up slaked carbide around the outlet of the water tube, as set forth."

I am not unmindful of the fact that the drawings and description refer to a bent rod or arm, but the real test, in such situations, was laid down as early as in Winans v. Denmead, 15 How. 330, 14 L. Ed. 717, and has often been applied. See Hutter v. De Q. Bottle Stopper Co., 128 Fed. 283, 62 C. C. A. 652, as expressing the views of this circuit.

I see nothing in the language added in the reissue to the original specification to warrant the conclusion that the patent was thereby broadened as to this point. The breaking up or stirring function is more fully described in words but no functional change is described. Possibly "pierce" might have been left out, but that, as a matter of words, is de minimis in this case.

On this "bent" and "straight rod" question, I am firmly convinced that the reissue is valid, and that the claim must be construed as includ-

ing a straight rod and as so construed is not a departure from the original patent. I fully realize that this puts me in disagreement with the Court of Appeals for the Third Circuit—a result which I would have preferred otherwise, for, in addition to the desirability of comity, I appreciate the experience and the high standing of that court. Yet I cannot escape the responsibility defined by Mr. Justice Brown in Mast, Foos & Co. v. Stover Co., 177 U. S. at page 488, 20 Sup. Ct. 708, 44 L. Ed. 856. The conclusion which I have stated was arrived at prior to my knowledge of the opinion in the Grier Case, and, after careful consideration, I am unable to change my views.

There is, however, a further question. Mr. Offield, for defendants, urged with much force and ability that defendants' construction embodied all of the elements of the original and abandoned claim 6 of the file wrapper, and that reissue claim 4 cannot be extended to embrace subject-matter subsequently disclaimed and abandoned in original claim 6.

The new part of claim 4, added by the reissue, describes the operation of the rod as follows:

"The rod operating to restrict and thus control the flow of water to the carbide."

The original claims, Nos. 1 and 6, in the file wrapper, were canceled. Canceled claim 1 did not include a stirrer. As a stirrer was an element of claim 4 of the original patent as finally allowed, and is an element of the same claim of the reissue, it is clear that there is no question of estoppel interjected into the consideration of the effect of this canceled claim 1 of the file wrapper.

Original claim 6 included a water tube and a restricting rod, and was set forth as follows:

"5. In a lamp of the kind described, the combination, with a water reservoir and a receptacle for calcium carbide, of a tube extending from the former into the latter so as to be embedded in the mass of carbide contained in the receptacle, a rod extending from a point outside the lamp, through the tube into the carbide receptacle, restricting the tube to permit only a predetermined quantity and rate of flow of water into the carbide, and a valve to cut off the supply of water to the receptacle, as set forth."

It will be noted that this language is broad; that it does not describe in words a stirrer; that it also includes a valve, which is an element not included in either claim 4 of the original patent or claim 4 of the reissue, and which, in my opinion, is a mere addendum, not playing any part in the action of the device or the combination which constitutes the invention. It is true that Exhibit B of the file wrapper shows a straight rod going through the water tube and embedded in the carbide receptacle; but it is equally true that what the inventor and the Patent Office examiner were skirmishing about was a matter of phraseology. Had the situation ended there, the cancellation of claim 6 might possibly have been construed as an estoppel; but the significant and controlling fact in the history of this file wrapper is that, after claim 6 was canceled, claim 4 of the original patent was allowed. That claim clearly described the rod as constituting a stirrer. Further, claim 6 was rejected on the Baldwin patent, No. 656,874, the,

Peck patent, No. 662,105, the Van Praag patent, No. 705,166, and the Schmitt British patent, No. 15,688. The study of those patents as explained in the testimony of Mr. Proctor, and as I have outlined supra in part, will demonstrate that as prior art references they were a good distance behind what Baldwin was trying to show to the Patent Office was his invention.

The file wrapper satisfies me that the examiner originally allowed claims containing the stirrer which now constitute claims 1, 2, and 3 of the patent, and that, after claim 6 was canceled, he allowed a claim (to wit, claim 4) broader than claim 6 in that it omitted the valve, and narrower than claim 6 in that it definitely included the stirrer. I fully agree with plaintiffs that if defendants' lamp, aside from the fact that it includes a valve, had a water restricting rod which did not constitute a stirrer, and if the patent had been reissued to cover a combination which was otherwise like claim 4, but did not include a stirrer, it could be successfully urged that the reissue should not be sustained against such a lamp.

The file wrapper history in my opinion comes down to this: That in a battle for words the inventor never gave up his struggle for the invention, but landed on language which later the courts construed as being too broad to be limited to a rod operating to restrict and control the flow of water to the carbide. The file wrapper is not to be overlooked, and is often highly important to prevent expansion or the effort to reclaim abandoned territory; but, as was pointed out by Judge Noyes in Westinghouse v. Condit Elec. Mfg. Co., 194 Fed. 427, at page 430, 114 C. C. A. 389, the bearing of the file wrapper on the language of the grant is not to be exaggerated.

Concluding, therefore, that the reissue is valid, I think that there is not any substantial question of infringement. The Justrite lamp has a valve which simply adds something which may be a good feature, by which in no way changes the function or differentiates the results of the combination of the patent.

Finally, it is urged that the Justrite Company should be relieved because of intervening rights which it has acquired. It will be remembered that this company entered the field with its lamp at a time when the validity and scope of the Baldwin patent were still unquestioned, and when, after some five years of capable effort, the Baldwin lamp had created an extensive market. The Justrite Company took its chances, and, in view of the necessities of the situation, it is relieved of all accountability for the period prior to the granting of the reissue patent; but when the reissue was granted the Justrite Company again took its chances.

By the reissuance of the patent, the patentee loses all in the way of an accounting under the original patent, but the dominant purpose of the reissue statute was to save to the inventor the future remaining after reissue. I see nothing in the course of plaintiffs or defendants which would allow a court of equity to conclude that defendants are to be relieved because of intervening rights.

Finally, I may say that, in the light of the decision of the Circuit Court of Appeals in the Bleser Case, the original specification turned

out to be insufficient, and claim 4 turned out to be broader than was originally supposed. The error thus made arose by reason of that inadvertence against which the statute was designed to protect. Motion Picture Patents Co. v. Laemmle, 214 Fed. 787. It has happened that I have had occasion to examine a number of reissue patents, and no case has appealed to me more strongly than the case at bar as one in which the inventor was justly entitled to the reissue.

The plaintiffs may have the usual decree; but, as it is desirable not to create an embarrassing trade situation pending appeal, the injunction will be suspended pending appeal. If an appeal is not promptly taken, plaintiffs may apply for a modification of the suspension.

Settle decree on seven days' notice.