**NAIVETTE, Inc., v. BISHINGER et al.**

**HEROLD BROS. CO. v. PHILAD CO. et al.**

Nos. 5945, 5946.

Circuit Court of Appeals, Sixth Circuit.

Oct. 12, 1932.

· 434

See, also (C. C. A.) 54 F.(2d) 623, 624.

W. B. Morton, of New York City (Pennie, Davis, Marvin & Edmonds, of New York City, Kwis, Hudson & Kent, of Cleveland, Ohio, and W. Brown Morton and E. H. Merchant, both of New York City, on the brief), for appellants.

Morris Kirschstein, of New York City (Harvey R. Hawgood and Hawgood & Van Horn, all of Cleveland, Ohio, Morris Kirschstein, of New York City, and T. Paul Titus, of Cleveland, Ohio, on the brief), for appellees.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

The four patents in suit, all held valid and infringed by the District Court, relate to the so-called "permanent" hair waving art. The appeals, while involving separate plaintiffs and defendants, are from decisions below in cases arising out of the same alleged act of infringement, tried as one, and argued and briefed together on review. The Herold Brothers Company is a dealer, and acquired the devices which it sold from Naivette, Inc. The patents in suit are Mayer reissue patent No. 17,393, originally granted March 29, 1927 (reissue application March 11, 1929), for hair waving appliance and method; the

Mayer reissue patent No. 17,585, originally granted March 1, 1927 (reissue application March 2, 1929), for permanent hair waving appliance; Decker patent No. 1,683,531, granted September 4, 1928, for hair waving outfit, and Bishinger patent No. 1,718,025, granted June 18, 1929, for hair curling appliance. Appeal No. 5945 is from decision on the Bishinger patent; appeal No. 5946 from decision on the other three patents.

For reasons which will become apparent, we discuss first Mayer reissue patent No. 17,393. Of the claims relied upon, claims 9 and 10 disclose a process of waving hair upon the human head. Claim 10 is perhaps the more important to our discussion, and the process there claimed is one which "comprises gripping a flat strand of hair adjacent to the scalp with a moisture tight clamp, winding said strand spirally from its end upon a rod nearly to said clamp, enclosing said strand together with moisture in a moisture retaining envelope, enclosing said strand and envelope within a heater extending about the same to the clamp, then causing the heater to supply heat to the strand."

The art of waving hair is an ancient one. It had its beginning in the practice of wig making, wherein two methods of waving were recognized, both, however, depending upon the effect of heat and moisture upon the hair. In the so called spindle method, described by this court in Nestle-Le Mur Company v. Eugene, 55 F.(2d) 854, the hair was wound helically, i. e., like a screw thread, on a spindle and then moistened and subjected to heat. In the Croquignole method the hair was wound spirally, i. e., wrapped in overlying layers upon a rod, and then similarly treated. The modern development of waving upon the human head followed somewhat the same line. Spindle waving was first and still is largely employed in the art. In this method the strand of hair is wound helically upon the spindle, a moistened wrapper is then applied to the hair, and the spindle and hair are inserted in an electrical heater and subjected to heat for a sufficient period. The Croquignole method, which is the one described by Mayer, differs from the spindle method in that the strand of hair is wound spirally on the rod beginning at the outer end of the strand instead of at the scalp. The devices employed are necessarily different in design, although they include to large extent the same essential elements.

The problem that it is claimed confronted Mayer was to produce a more natural appearing wave than had been made by the

spindle process. He appreciated that the hair should be wound into a true circular or spiral form rather than into a helix. He understood that to give permanence to the wave it would be necessary not only to subject the wound strand to heat and moisture, but that while being so subjected each filament of the strand should be held under tension. The importance of a tight wind was recognized in the spindle process, as the court noted in the Nestle Case, but it had been a relatively simple matter to obtain it, because in that process the strand of hair was gathered into a round bunch and the operator holding the rod and strand pulled the hair taut as he wrapped, and as the ends beyond the operator's hands were free, slippage of one filament upon another made no difference to the tension of the wind. In producing the Croquignole wind, however, it is impossible to start at the scalp and work outwardly, so it became necessary to start at the outer tips of the hair and wind down toward the scalp, with the curler rod held in a horizontal position, that is, parallel to the scalp. As uniform tension was desired throughout the width of the strand, it was necessary to use both hands to hold the ends of the curling rod. This precluded possibility of holding onto the strand between the curler and the head, so that any pull exerted upon the hair had to be taken by the scalp, and since considerable pull was necessary to provide tension, if this pull were not uniformly distributed over the entire section of skin from which the strand extended, the result became painful to the person operated upon, and some of the hair might be pulled out by the roots.

Mayer overcame this difficulty by forming the strand of hair into a flat band before winding, and then engaging this band close to the scalp with a protector clamp, which gripped the hair tightly so that no hair could be moved relative to the other, and when all the filaments were combed to lie in direct lines from the scalp to the protector a pull upon the protector or upon the strand on the side of the protector clamp away from the scalp distributed the tension uniformly between all of the filaments; the force exerted upon each hair being relatively slight, and causing no discomfort. The gathering of the hair into a flat thin band by the clamp also made it possible to exert tension on each filament as it was wound, and not merely upon the outer filaments, and so improved the resulting wave. The step of forming the hair into a thin flat band before winding, and the exertion of uniform tension upon all of its filaments by means of the protector clamp, are claimed to be the bases of the entire Croquignole waving art as now practiced. To the patentability of the Mayer process thus briefly described are interposed the usual defenses of anticipation and lack of invention, supported by voluminous references to the prior art.

■ We are not impressed by the contention that Mayer was the father of the Croquignole wave. Croquignole waving was old in the art of wig making, and was disclosed in numerous patents dealing with the waving of hair upon the human head, the most important references being the patent to Popin, No. 1,416,750, issued May 23, 1922, and the patent to Szlanyi, No. 1,400,637, issued December 20, 1921. In fact Mayer himself calls attention to the two styles of hair waving in use at the time of his application. The most that can be said for the process claims of the first Mayer reissue patent is that if it presented something new it disclosed merely an improvement in the art of Croquignole waving, and if so he is of course entitled to a monopoly on the improved method, if it involved invention. Whatever novelty there is in the process of Mayer seems to us to be found only in the manner of forming the hair into a flat band, and in the winding and keeping of it under tension. It is true that Popin in his earlier patent, No. 1,447,997, issued March 13, 1923, discloses a flat band, surrounded by a shield intended to function as an insulating device. It is clear that while the desirability of a flat strand is indicated, the strand cannot by Popin's shield be held under tension away from the scalp, nor is the means employed useful in holding the several filaments of the strand in the exact relation to each other now considered so desirable in the art of Croquignole waving. It is also true that in the spindle art tension upon the filaments was thought to be necessary to secure a satisfactory wave or curl, but in the spindle process the obtaining of tension upon the hair is relatively a simple matter. New methods of obtaining and keeping the hair under tension were necessary to be devised in giving the Croquignole wave.

■■ But novelty alone (utility not being questioned) does not denote invention. It is not our purpose to add to what has already been said of the inventive concept, the "something more" that in addition to novelty, utility, and mere mechanical skill must be present if invention is found. "In many cases the presence of invention is made instantly mani-

fest to the mind of the court from the patent itself, in view of the prior art; or it may be shown by commercial success, by the fact that the device [or process] satisfies a long-felt want, or by broad acceptance and use." Seymour v. Ford Motor Co. (C. C. A. 6) 44 F.(2d) 306, 309. With this in mind, and recognizing that the question of invention is close, we are unable to ignore the impressive story, told by the record, of the reception of the Mayer method by those working in the art and by the public. The Mayer patent first came to notice of hairdressers in the United States through an announcement in a German trade paper. Metzinger, in Oakland, Cal., immediately recognized that it was something he wanted and wired Mayer at Carlsbad, ordering a machine. Kietz, of Cleveland, saw an announcement and left at once for Europe to see Mayer, and obtained the agency to sell all the machines in the United States and Canada. Hyman & Oppenheim, of New York, wrote their senior partner in Europe to communicate at once with the inventor in Carlsbad. Following the arrival of the Mayer appliances, demonstrations of the method in New York, Cincinnati, and elsewhere created the keenest interest among hairdressers and in the trade. Samuel Bonat, senior member of Samuel Bonat & Brothers, controlling Naivette, Inc., appellant, witnessed a demonstration by Kietz in New York, and inquired about selling license and agency, but was too late. A very large business immediately followed the organization of the Realistic Company, first selling and later manufacturing under license from Mayer. From 1927 to 1930, upwards of three thousand machines were sold for nearly a million dollars. This public reception of Mayer's method or machine indicates that something new had been disclosed which solved some real problem, and was more than a mere trivial improvement in the art. We think such acceptance compels decision in favor of the validity of the contested process claims of the first Mayer reissue patent.

■■■ Before dealing with infringement, it seems logical to consider the other claims in issue, and the claims of the second reissue patent, as well as the patents to Decker and Bishinger. In addition to the process claims, claims 5, 6, and 11 of the first Mayer reissue patent are for a hair engaging clamp comprising two elongated heat insulated bars, pivotally connected at one end and detachably connected together at the other end, and for rather simple variants of such clamp. The second Mayer reissue patent, of the claims of which claim 4 is typical, is for a heater comprising a pair of rigid levers pivoted intermediate their ends, an arcuate casing with straight parallel edges carried by one end of each lever, a heat insulating grip at the other end of each lever, electrical heating elements within said casings, and a spring between said levers pressing said casings toward each other. Given a process that is patentable, we are confronted with the relationship of process to machine. It is settled that there is a fundamental difference between process and machine, and the process may be patentable irrespective of any particular form of machinery or mechanical device for practicing it. The converse is also true. This has been so recently and so thoroughly discussed by this court in Nestle-Le Mur Company v. Eugene, supra, that there is no need of amplification. Having discovered a new process for giving the Croquignole wave, it became necessary for Mayer to reduce it to practice, either by known appliances, or by those newly devised. Until he accomplished this his conception was not a patentable invention, because useless. Reo Motor Car Company v. Gear Grinding Machine Company (C. C. A.) 42 F.(2d) 965. If the means for putting his process into practice were obvious, or already disclosed by the art, no invention was involved in making use of them, no matter how clearly the process might disclose invention. Nestle-Le Mur Company v. Eugene, supra. Mayer, conceiving that holding a flat strand of hair under tension was a necessary step in his new process, the use of a clamp for that purpose must have been obvious. Moreover, clamps were found in the art performing substantially the same function, as in the Pauser patent, No. 1,340,738, May 18, 1920, and in the still earlier Jacob patent, No. 1,268,848. There is no contradiction in sustaining validity of a process, which includes clamping as a step in a new combination, and yet to deny validity to the patent for a clamp as a unitary device. Nor is the consideration we have given to commercial acceptance of the Mayer process persuasive of invention in the appliance, since novelty is the essence of invention, and the appliance is not new. While commercial acceptance of the Mayer machines leads us to sense invention in the process, their public reception is amply explained by the novelty and utility of the method. And so with the heater of the second Mayer reissue patent. A heater performing the same function, but in the form of a cylinder, was well known in the spindle waving art. It could not be used in that form for Croquignole waving because

of the necessity for clearing the strand of hair at the scalp. It certainly was not beyond the skill of the mechanic to divide the cylinder into two arcuate members for that purpose, and even if so, similar divided heaters are disclosed in the Popin and Szlanyi patents, and in the patent to De Ruvo, 1,404,-587, January 24, 1922. Certainly there can be no invention in pivoting levers intermediate their ends, or in insulating grips upon electrical appliances. We conclude, therefore, that claims 5, 6, and 11, of the first Mayer reissue patent are invalid because lacking in invention, and because anticipated, and that all of the claims of the second Mayer reissue patent sued upon are invalid for the same reasons.

Of the Decker patent, claims 1 and 5 are in suit. We do not recite them, for the most that is now contended is that Decker improved upon the protector and heat insulating clamp of Mayer by combining them so that both could be applied in a single operation; that he increased the thermal insulating qualities of the combination by the inclusion of an air space between them, and provided a cam latch to press the arms of the protector clamp together so that with a relatively small pressure upon the handle of the latch a very tight grip upon the filaments of the strand was obtained. We fail to see invention in Decker. He combined old elements, but manifestly in such a way as must have been obvious to anyone skilled in the art, and the combination produced no new result. If what he did marked any improvement in the art, it solved no real problem and answered no recognized need, and such advance, if any, as was achieved was altogether too trivial to rise to the dignity of invention. Seymour v. Ford Motor Company, supra.

It is claimed for Bishinger that he devised a curler rod with ratchet teeth in the ends, and spring pawls upon the protector clamp to engage the teeth. This not only facilitated the winding operation, but gave a more positive lock to the curling rod, and permitted him to increase the tension on the hair by turning the rod after it had been positioned upon the protector clamp. The ratchet and pawl are ordinary mechanical expedients commonly used in all the arts to prevent unwinding, and are disclosed in the hair waving art in the patent to Gaire, No. 1,610,855, December 14, 1926, in relation to Croquignole waving, and in the Nessler patent, No. 1,105,595, of July 28, 1914, in respect to spindle waving. We see neither novelty nor invention in the Bishinger patent.

It is clear from what we have said that we are concerned with the question of infringement only as it may relate to the method claims of the first Mayer reissue patent. We have seen that a patent for a new and useful process is not invalidated because of a lack of novelty in the mechanical means disclosed for practicing it. Nestle-Le Mur Co. v. Eugene, supra. Such process patent will cover all means of practicing the process, whether disclosed or not. Corning v. Burden, 15 How. 252, 14 L. Ed. 683. It must follow that if appellants manufactured or sold appliances organized into a unitary device for practicing the patented method, that such manufacture and sale constituted contributory infringement. Lyman Mfg. Co. v. Bassick Mfg. Co. (C. C. A.) 18 F.(2d) 29. This rule was also fully discussed in the Nestle-Le Mur Case. That there was infringement of the method claims of the Joseph Mayer reissue patent is not seriously disputed. The District Judge so found, and we are unable to say upon this record that there was error in the finding, unless the claim of immunity based upon asserted intervening rights of appellant Naivette, Inc., is of avail to appellant Herold Brothers.

The defense last mentioned necessitates recital of further facts. Naivette, Inc., is the successor of the Naivette Permanent Wave Manufacturing Company. Both are claimed to be the creatures of Bonat & Bros., who owned all of the stock of each. Bonat & Bros. claim to have sold alleged infringing appliances prior to the date of the reissue application through a sales company called Duart, and also through the Naivette Company before its incorporation. Whether if intervening rights arose in favor of Bonat or of Duart they passed to Naivette, Inc., without express transfer we need not decide, for while the record may lack somewhat in clearness upon the subject, it seems reasonably adequate to show that Naivette, Inc., itself sold appliances designed to practice the patented method both before and after the date of the reissue application. Certainly it advertised an organized machine which illustrated the process, and the record is as clear that it sold such machines prior to the reissue application as that it infringed thereafter. The defense of intervening rights is raised only in the Herold Brothers' appeal, because there only is the first Mayer reissue patent in issue. Herold Brothers is a dealer, and claims im-

munity because it purchased appliances from Naivette. If intervening rights arose in favor of Naivette, and if such rights are equivalent to a perpetual license to Naivette, we assume the defense is open to Herold Brothers, for the right to sell must imply a right by the customer to buy and resell.

In Ashland Fire Brick Company v. General Refractories Company, 27 F.(2d) 744, this court concluded that intervening rights may arise as against a reissue patent even if such reissue is applied for within two years from the grant of the original patent. The facts of the instant case are sufficiently analogous to those of the Brick Case to warrant assuming that some rights and consequent immunity arose in favor of Naivette. The difficulty that presents itself is to determine the extent of Naivette's intervening rights, if any, and the degree of immunity that results. In Keller v. Adams-Campbell Company, 264 U. S. 314, 44 S. Ct. 356, 357, 68 L. Ed. 705, the Supreme Court phrased it thus: "The sole question was whether one who makes and sells articles not covered by the claims of an original patent, but embraced by the enlarged claims of a subsequent valid reissue, applied for within 7 months [within 2 years] after the original was granted, has intervening rights such that he is not only immune from liability for what he has made and sold, but enjoys an irrevocable and permanent license to continue to make and sell without restriction." The question thus put in the Keller Case was not therein answered, because not necessary to decision. In effect the court invited the presentation of it in a proper case. Nor is complete answer found in decisions of the several Circuit Courts of Appeals. In the Ashland Fire Brick Case, this court went no further than to hold that the defendant therein, who had made two alleged infringing fire brick machines between the date of the original patent and the reissue application, had acquired a right to continue to use the two machines as if it held a license therefor under the reissue patent, although the defendant therein contended in the court below (D. C.) 15 F.(2d) 215, that it had not only acquired the right to continue to use the two machines, but to make and use such other like machines as it chose. That in the absence of equitable considerations requiring a broader remedy, the implied license to make and sell growing out of intervening rights

terminates with the filing of a reissue application, seems to be the effect of the decision in the Eighth circuit in Bull Dog Floor Clip Company v. Munson Manufacturing Co., 19 F.(2d) 43. In Baldwin v. Abercrombie & Fitch Company (D. C.) 227 F. 455, 461, the District Judge concluded that, "By the reissuance of the patent, the patentee loses all in the way of an accounting under the original patent, but the dominant purpose of the reissue statute was to save to the inventor the future remaining after reissue." Affirmed Id. (C. C. A.) 228 F. 895; Id., 245 U. S. 198, 38 S. Ct. 104, 62 L. Ed. 240. We are aware that there are holdings to the effect that one who acquires an intervening right under such circumstances as are here disclosed acquires thereby not only immunity for devices already manufactured, but an irrevocable license to continue in the business of manufacturing them. Autopiano Company v. American Player Action Co., 222 F. 276 (C. C. A. 2). That case, however, involved a second reissue application and it could not be assumed that the first reissue was, like the original patent, based on inadvertence.

The record does not disclose that either Naivette or Herold Brothers were manufacturers, or that they had made any substantial investment in machinery for the production of the appliances organized into a unitary machine for the practice of the protected process, and since we assume that decision here does not preclude the sale of noninfringing devices not so organized, we conclude that equity does not require us to give effect to Naivette's intervening rights as though it held a license for any period beyond the date of the reissue application. This being so, the defense is not available to Herold Brothers, since the record does not disclose any machines sold by it which were made by or for Naivette prior to such application.

The decree in case 5945 is reversed, and the cause remanded with instructions to dismiss the bill. The decree in case 5946 is affirmed in so far as it holds claims 9 and 10 of the first Mayer reissue patent valid and infringed, and is in all other respects reversed, and the cause is remanded for further proceedings consistent herewith. In view of our conclusions, no costs are allowed either party in case 5946.