## PHILAD CO. v. RADER.

### No. 7446.

District Court, E. D. New York.
June 26, 1936.

Morris Kirschstein, of New York City (T. Paul Titus, of Cleveland, Ohio, of counsel), for plaintiff.

Charles H. Sterenfeld, of Brooklyn, N. Y. (Maurice S. Cayne, of Chicago, Ill., of counsel), for defendant.

BYERS, District Judge.

This is a suit in equity in which the plaintiff seeks the customary injunction and accounting for the alleged infringement of Letters Patent, namely, Reissue Patent No. 18,841 which is a reissue of Reissue Patent No. 17,393, the original Patent having been No. 1,622,957 (application filed March 19, 1925, in the United States, and in Germany April 9, 1924).

The plaintiff corporation is the owner by assignment of the Patent in suit, and the defendant is a dealer in certain devices which are alleged to infringe.

No issue is made on the subject of infringement, and the defenses are invalidity, (a) that there was prior knowledge and public use of the patented process, and (b) that the Patent in suit is invalid for lack of invention over the prior art.

Invalidity is further asserted on the following grounds:

(a) The intervening Reissue Patent No. 17,393 was void on the date of its surrender, May 30, 1933, because no disclaimer had been entered in the Patent Office of certain of its claims which had been held invalid by the Circuit Court of Appeals for the Sixth Circuit on October 12, 1932. (Naivette v. Bishinger, 61 F.(2d) 433).

(b) Reissue Patent No. 17,393 was invalid because the failure to assert claims like 8, 9 and 10 in the original Patent No. 1,622,957 was not due to inadvertence, the subject matter of those claims having been deliberately surrendered in the prosecution of the original Patent.

(c) Reissue Patent No. 17,393 was invalid and void because there was unreasonable neglect and delay in filing the application therefor.

(d) The Patent in suit, Reissue No. 18,-841, is invalid because it does not describe the process which it purports to claim in such manner as to meet the statutory requirements of section 4888, Rev.St. as amended, 35 U.S.C.A. § 33.

These defenses are stated in the order of their importance to this controversy.

The Reissue Patent in suit was filed March 30, 1933, and covers the process of waving hair upon the human head so as to closely simulate naturally wavy or curly hair. The Patent describes the various devices by which the desired result is said to be produced, and the claims in suit are Nos. 3 and 5, reading as follows:

"3. The process of waving hair upon the human head which comprises dividing the hair into flat strands, gripping one strand adjacent the scalp of the wearer with a clamp, winding said strand spirally from its end to near said clamp upon a rod, covering said strand with an absorbent material containing hair treating solution, next covering said strand and material with a moisture retaining envelope, and then applying heat to said strand."

"5. The process of waving hair upon the human head which comprises gripping a flat strand of hair adjacent to the scalp with a moisture-tight clamp, winding said strand spirally from its end upon a rod nearly to said clamp, enclosing said strand together with moisture in a moisture retaining envelope, enclosing said strand and envelope within a heater extending about the same to the clamp, and then causing the heater to supply heat to the strand."

The last-quoted claim was claim 10 of Mayer Reissue Patent No. 17,393, which was adjudicated by the Circuit Court of Appeals of the Sixth Circuit in the case of Naivette v. Bishinger, 61 F.(2d) 433, 435, and therein upheld as a valid process claim.

Claim 9 of the same Patent was also upheld and is said to be the same as claim 4 of the Patent now before the court, which is not in suit. For ready reference, it is here quoted:

"4. The process of waving hair upon the human head which comprises dividing the hair into flat strands, surrounding one strand adjacent the scalp of the wearer with a clamp, winding said strand from its end to near said clamp upon a rod, treating said strand with a solution and enclosing the strand in a substantially moisture-tight envelope, covering said envelope with a sectional heater extending to said clamp, and then causing said heater to apply heat to said strand."

The opinion in Naivette v. Bishinger, supra, contains such a discussion of the art of hair waving as here involved, that repetition of what is therein said is unnecessary. It will suffice to state that two methods have been known, namely, the spiral or spindle method, and the Croquignole. In the former, the hair was wound helically, that is, like a screw thread, on a spindle, then moistened and subjected to heat; in the latter, the hair was wound spirally, that is, wrapped in overlying layers upon a rod and then heated. In spiral winding, the

operation commences at the scalp and is completed at the hair ends, and in the Croquignole method, winding begins at the hair ends and continues to or near the scalp.

In both processes, it is required that tension be applied to each filament of hair during the winding in order that the hair may be stretched, and this tension must be retained while the heat is being applied.

In spiral winding as practised when hair waving upon the human head came into vogue, the operator could protect the scalp of the subject by holding the strand in his left hand at the scalp, and he was enabled to conduct the winding operation under tension supplied by the right hand, and then to tie the strand in its wound condition, and then apply the moisture and the heat.

As the Croquignole process required the winding of the strand from the hair end toward the scalp and as each filament of hair had to be uniformly stretched and curled, the operation could not be performed unless an intervening agency was supplied to relieve the subject of the sensation of pulling while the winding proceeded.

That was the recognized problem in Croquignole winding which existed when it was desired to impress this particular kind of wave upon the human head, but it did not exist when artificial hair was so waved, and thus it follows that, while Croquignole waving was known for many years prior to the granting of the Mayer Patent, it could not be practised except in the treatment of artificial hair.

The problem was solved by Mayer in the introduction of the clamp referred to in the foregoing claims. That was a device which was used so as to admit of the application of tension to the strand between the clamp and the hair ends, and this tension was not communicated to the scalp of the subject; this permitted not only the use of tension during the winding but its retention during the setting of the curl.

This much may be quoted from the opinion in the case of Naivette v. Bishinger, supra, to indicate the authority for what has been stated thus far in this opinion:

"It is true that Popin in his earlier patent, No. 1,447,997, issued March 13, 1923, discloses a flat band, surrounded by a shield intended to function as an insulating device. It is clear that while the desirability of a flat strand is indicated, the strand cannot by Popin's shield be held under tension away from the scalp, nor is the means employed useful in holding the several filaments of the strand in the exact relation to each other now considered so desirable in the art of Croquignole waving. It is also true that in the spindle art tension upon the filaments was thought to be necessary to secure a satisfactory wave or curl, but in the spindle process the obtaining of tension upon the hair is relatively a simple matter. New methods of obtaining and keeping the hair under tension were necessary to be devised in giving the Croquignole wave."

That decision has been followed in other litigation between this plaintiff and other defendants in which some of the questions here involved have been decided in the plaintiff's favor:

The Philad Company and The Realistic Permanent Wave Machine Company v. Florence Frey, U. S. District Court, Southern District of Ohio, Western Division, Equity No. 835, dated November 7, 1935.[1]

The Philad Company and The Realistic Permanent Wave Machine Company v. The Johnson Company, Inc., U. S. District Court, Southern District of California, Central Division, Equity No. 18–H, Report of Special Master David B. Head (now before the District Court on Exceptions).

The Philad Company v. Modernistic Permanent Wave Machine Company, U. S. District Court for District of Minnesota, Fourth Division, Findings and Conclusions in favor of the plaintiff dated April 6, 1936.

The matters previously stated are necessary to an understanding of much that is urged on the part of the defendant to establish that the process covered by the Patent in suit had been anticipated by one Hannah Jacobs, who is said to have had prior knowledge thereof and who promoted public use of the process more than two years before the filing date (March 19, 1925) of the first Mayer U. S. Patent. This is the major defense.

It may be said at the outset that this subject was considered by Judge Nevin in the case first above referred to, and he decided that this alleged prior use had not been established. As the nature of the

---

[1] Not furnished by court for publication.

evidence submitted to him does not appear from his decision, it may be proper to discuss that which was offered in this case on the same issue, in order that the reason for the decision on this point may be made reasonably clear.

Mrs. Hannah Jacobs conducted the business of selling permanent wave supplies and equipment pertaining to the permanent wave business, and did hair-dressing and permanent waving during the year 1921 and thereafter; her business was conducted under the name of Gem-Air Permanent Wave Company, Inc., at 683 Fifth Avenue, New York City. This is true at least through the years 1921, 1922, 1923 and 1924, as to the place of business. The Gem-Air Company was continued until 1934, but its location during the ten years prior to 1934 is not clear. The lady is now conducting business under her own name at a Brooklyn address.

Her testimony, stated shortly, is that late in 1922, and during 1923 and 1924, she practised the process of Croquignole waving, and her recital obviously was intended to portray her practise as having been substantially as stated in the claims of the Patent in suit.

It will be recalled that the two-year period, as to which this defendant has assumed the burden of proof, began on March 20, 1923, so that the controlling activities of this witness and those called to corroborate her, by her own showing, were confined to a few months, dating back some thirteen years prior to the giving of her testimony.

She produced no records of manufacture or sale of any devices whatever during that period.

Reliance is had in part upon a booklet probably issued at an unnamed date in 1923, and sundry trade-paper advertisements starting with January, 1922, and continuing at regular monthly intervals for the ensuing two years.

These publications are much more limited in their disclosures than this witness's testimony on the stand. She was at pains to reiterate that she did, during the critical period, several things that were incidental to giving the Croquignole wave. That she used the Croquignole pin in giving it; that a device she manufactured was "For my Croquignole heater to bake the Croquignole wave." That the booklet illustrates "my Croquignole permanent wave machine, the same as I demonstrated the heaters here."

The booklet does not illustrate nor expound a Croquignole permanent wave machine, nor do the advertisements in evidence.

In other words, the witness, speaking in the 1923 booklet which she says she wrote, is not in accord with herself on the witness stand in 1936.

The booklet describes a permanent wave machine which substitutes individual air tube connections to the heater elements, in place of the hood of an earlier model; also a "drip-pan protector for the scalp."

In the booklet, it is stated: "Our apparatus can make any wave, flat or round, also ringlets. It will curl bobbed hair in ringlets from the ends up."

Speaking of the pins, it is said that they are used successfully for bobbed ringlets, "the hair is piped from the ends up in perfect ringlet form, same as Croquignole."

Again, that the piping pins are "what you have been waiting for. A perfect, permanent bob ringlet, piped from the ends up, in ringlets * * *."

"This improvement is so arranged that it first clasps the ends of the hair on the curling pin and is on a pivot so as to wind the hair over and over each other in flat ringlet form up toward the scalp same as croquignole, taking in any length of hair due to the pivoted pin which can be fastened without the aid of cord, string, tape or elastic bands, with just the pressure of the fingers against the pin."

The only other quotation which is deemed important is this: "When manufacturers pipe natural hair for making up false hair goods in which bobbs and ringlets or curly bangs are used they pipe the hair from the ends up which is called croquignole or ringlet."

The foregoing have been culled from some twenty pages or so of text which accompanies six pages of illustrations. The reading matter is replete with repetition and is in the conventional form of selling patter, and may be deemed to contain all that Mrs. Jacobs, speaking in 1923, claimed for the Gem-Air contrivances.

No statement is made that Croquignole waving was accomplished by any process whatever, through the use of the Gem-Air machine or accessories.

The reference to what manufacturers of false hair goods did, reveals accurately the state of Mrs. Jacobs' knowledge concerning Croquignole waving in 1923, that is, that it was then practised on false hair.

The earlier patents discussed in Naivette v. Bishinger, supra, had not met the requirements of imparting this particular wave to natural hair upon the human head, and this is consistent with the quoted recital by Mrs. Jacobs that, in 1923, Croquignole winding was applied to false hair only.

If Mrs. Jacobs had perfected a device in 1923 to meet the then existing requirement, her advertising would have said so. In the absence of any such assertion in the booklet or the trade-paper advertising, it is concluded that what she was then claiming was a pin for piping or winding from the ends, short lengths of hair not adapted to spiral winding.

Mrs. Jacobs filed an application for a patent on February 19, 1923, which was granted as No. 1,477,873, on December 18, 1923, covering a hair-waving device which is a curler. It is said to be adapted for winding a round curl or ringlet.

That patent shows her inventive concept within a month of the beginning of the two-year period under consideration. Coupled with the booklet and the trade-paper advertising, it is convincing evidence that whatever knowledge she now possesses of the essential requirement for Croquignole waving on the human head came to her after the patent was applied for by Mayer, of which the patent in suit was a second reissue. It thus becomes unnecessary to discuss the evidence of the other witnesses on this subject, although it has been carefully considered.

The demonstrations in court of the process of applying this wave to the human hair by defendant's witnesses, were confined to false hair; that the Jacobs winding pin or curler pin cannot yield successful results, because of its uniform diameter, seems to have been shown, although the decision on this branch of the case will not rest upon that basis.

Exhibits U and Y produced by the defense were stated to be the same as the gauges or spacers employed by Mrs. Jacobs and two hair-dressers who purchased her machine, and testified that they practised Croquignole waving on the human head in 1922 and early 1923.

The devices are not described in the said current literature as clamps, the office of which was to arrest the tension upon the hair being waved, during the process of imparting the curl.

It will be assumed for this discussion that the devices in evidence are authentic as of some indefinite time. If they had been perfected during the critical period and had been designed to perform the essential office heretofore referred to, they would have been proclaimed far and wide as necessary adjuncts to the application of the process under discussion. No such claim was made, and it is therefore concluded that the necessity, which clamps properly constructed would meet, was not understood and therefore was not the subject of study or experimentation by Mrs. Jacobs, during the years 1922, 1923 or 1924.

The references in the booklet and trade-paper advertising to the use of curling pins for bobbed hair, to produce ringlets, falls far short of teaching the plaintiff's process. It may well be that such pins were used in winding short curls in connection with the spiral process, as to strands which could not otherwise be waved. But there is no teaching in these publications of the use of the "gauges" or "spacers" as clamps to take up tension.

The use of the quoted terms was deliberate and consistent with the necessity for not winding any curl whatever within a definite distance from the scalp, for the heater tube as originally employed by Jacobs was disposed vertically, or substantially so, to the head of the subject; that is, it was "up-ended" in the 1922 and early 1923 type of Gem machine; later, perhaps during the latter part of 1923, another type of heater (Ex.C.C.) was substituted which assumed a parallel position to the subject's head, but the incidents of that change and the true reason for making it are not shown to have proceeded from any recognition of the problem solved by Mayer, or an attempt to meet its requirements.

■■ It is concluded therefore and found, that the defendant has not sustained the burden of proof necessary to establish prior knowledge or public use of the process taught by Mayer, within two years preceding March 19, 1925.

The second defense is that the claims in suit do not disclose invention over the prior art. The major assault is upon the

failure of the process embodied in these claims to assert in so many words, that the clamps grip the hair so as to take up the pull which would otherwise be transmitted to the scalp, thus permitting tension to be uniformly applied to each hair in the strand while the curl is made, without discomfort to the subject.

It must be recalled that the completeness of the disclosure depends upon the extent to which those skilled in the art would be enabled to apply the teachings of the patent.

The evidence in this case is uncontradicted that among hair-dressers it is familiar knowledge that a wave or curl of the so-called permanent character cannot be imparted to human hair unless the latter is stretched as an incident to the operation. In the light of that understanding, the language of claims 3 and 5 that the process involves "gripping one strand adjacent to the scalp of the wearer with a clamp" and "gripping a flat strand of hair adjacent to the scalp with a moisture-tight clamp" must be held to reveal that an inevitable consequence of the use of the clamp is to render the hair held in it subject to the exercise of tension which is not projected to the scalp because of the intervention of the clamp.

Such a teaching is not found in Popin No. 1,376,358 covering an insulating device of fabric impregnated with a hair-treating solution; or in Popin No. 1,416,-750 for a hinged heater to be used in hair-waving; or in Popin No. 1,447,997 covering a heat insulating slotted shield to rest on the scalp for use in hair-waving; or in Szlanyi No. 1,334,719 for a hair waver in tubular form containing asbestos packing and a rod, etc.; or in Jacobs No. 1,-477,873 for a curler to be used in making ringlets; or in Szlanyi No. 1,400,637 for the process of hair-waving by rolling a strand of hair and covering the roll with evaporating media and then enclosing the whole; or in Popin No. 1,447,998 for a curved clamping curler, so contrived as to lock the curl when it has been formed; or in Pausser No. 1,340,738 for hair curling or crimping apparatus and process; the latter is confined to crimping and involves twisting or crimping, moistening and confining the moisture to the strand of hair within a container, and heating the moisture to substantial evaporation and then drying the crimped hair.

These are the patents upon which defendant relies, and they do not disclose the process taught by Mayer.

It is concluded that the claims in suit are valid as challenged in this branch of the argument, in that they involve patentable invention.

This result is fortified by the decisions heretofore reached in other jurisdictions on the same question.

■ Turning now to the various assertions of invalidity based upon alleged procedural infirmities said to attach to the Patent in suit which have been heretofore recited:

A. As to whether Reissue Patent No. 17,393 was void:

The argument is that because no disclaimer had been filed of the claims held invalid in Naivette v. Bishinger, supra, when the reissue was sought, the latter was without legal effect because the entire original Patent No. 1,622,957 was then void. The scope of the disclaimer in the reissue application, is not questioned.

This directs attention to what was sought to be accomplished by the reissue, and the lapse of time involved. It will be convenient to fix the latter clearly and at once:

The decision of the Sixth Circuit Court of Appeals came down October 12, 1932. On December 16, 1932, the petition for rehearing was denied. Ninety days thereafter, or on March 16, 1933, the time to petition for certiorari expired. Four days later, or March 20, 1933, the application for reissue was filed; the application was granted, and the Patent bore the number 18,841, being the Patent in suit. The defendant's brief seems to be confused as to the respective filing dates for the reissues.

As to No. 17,393, application was filed March 11, 1929, for reasons stated by the witness Spaeth, and the reissue date is August 6, 1929. No procedural infirmity is disclosed with reference to the solicitation thereof.

The question for decision under this branch of the case is whether the disclaimer involved in the application which resulted in the granting of the Patent in suit was timely, and legally sufficient because it formed part of a reissue application.

As to the procedure itself, the plaintiff relies upon Motion Picture Patents Co. v.

Laemmle (D.C.) 214 F. 787, and no good reason appears to apply, in this case, any stricter rule than governed that decision. Despite the essential difference between the results which flow from the election between the disclaimer and the reissue routes to the recasting of a Patent, it is not easy to perceive why that mere choice should introduce substantive difficulties into a procedural situation. A disclaimer embodied in an application for reissue, is still a disclaimer and inures to the public as completely in that guise as if standing alone. It is accessible under the rules and decisions of the Patent Office. See: Rule 91 of Patent Office Practice; Ex parte Moore, 364 Official Gazette 775 (1927).

This disclaimer was filed 94 days after the decision of the Sixth Circuit Court of Appeals, which was well within 30 days after the right to apply for certiorari had expired.

The patentee lived in Czechoslovakia, and his papers required consular authentication at Prague. They had to be translated into German for him to understand them. Under the evidence in this case it is deemed to have been shown that the action taken was timely, and legally sufficient. That is, this argument against validity has not been sustained.

■ B. That Reissue Patent No. 17,393 is invalid because it was improvidently granted, in that it sought to recapture in claims 8 and 9 (which are the claims in suit of Reissue Patent No. 18,841) that which had been abandoned in claim 1 of the original application after disallowance thereof by the Patent Office.

This contention is of weight in light of the well established rule applied in this Circuit in Hatmaker v. Dry Milk Co. (C.C.A.) 34 F.(2d) 609, and in the Sixth Circuit in Union Switch & Signal Co. v. Louisville Frog, Switch & Signal Co. (C.C.A.) 73 F.(2d) 550.

If these claims by fair construction are but repetitions of original claim 1, clothed in verbal changes of costume only, the defendant's argument must prevail. It is thought, however, that this is not the fact. These claims are narrower, by perceptible margins, than that which was cancelled because of rejection, namely, the process is restricted to use upon the human head, thereby excluding its application to false hair strands; the clamps are restricted to those which grip, which imports more than a mere holding in position; and the nature of the covering applied to the curl is specific instead of general; finally, the method of applying the heat is definitely restricted in the modified claims as compared to the original claim 1.

It is held therefore that these claims do not fall within the decisions upon which the defendant relies.

■ C. The asserted invalidity because there was unreasonable neglect and delay in filing application for Reissue Patent No. 17,393.

The application was filed March 11, 1929, eighteen days less than two years after the grant of the original Patent No. 1,622,957.

The lapse of time is clearly shown, but no public injury is sought to be established. No witness was called who asserted that he had developed a competing process (in reliance upon some claimed defect in the original Patent) which fell within the terms of the Reissue. Failing that element of proof, there seems to be nothing to support the argument. True the defendant's brief contains such a statement on page 65, but it is unsupported by any citation to the record, nor has the court's reading of the testimony or notes taken at the trial brought any to light.

If infringement of product claims were now in issue, it might be requisite to inquire into the extent to which the defendant might be thought to have sustained his burden of proof. In the absence of such a duty, the subject requires no discussion.

■ D. Finally, it is contended that the Patent in suit does not meet the requirements of section 4888, Rev.Stat. as amended (35 U.S.C.A. § 33), in that the process is not so described as to enable a skilled person to use it.

The argument is that the claims in suit do not explain that the clamp admits of the application of tension to the strand of hair, without discomfort to the subject, while the wave is being imparted, and its retention while the wound strand is being treated for that purpose.

If the court has been misled by the testimony that such a requirement has been known to those skilled in this art for many years, it shares that misunderstanding with every other court which has been called upon to adjudicate this Patent.

The tuition required in instructing the general public in the repairing of runs in hose (Stelos Co. v. Hosiery Motor-Mend Corporation, 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414) is obviously to be contrasted with that which is adequate for the teaching of such a restricted class of persons as those who practise hair-waving. They necessarily understood what Mayer taught, according to the uncontradicted testimony in this cause, and this assertion of invalidity is deemed to be without justification in this record.

Decree for plaintiff with the usual injunction and accounting. If findings are desired, they are to be settled in connection therewith.